IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

HERMAN RAY HEFLIN, JR.,

                     **Plaintiff,**

     v.                                  **1:06-cv-1271-WSD**

PPG INDUSTRIES, INC., PORTER
PAINTS, and PPG
ARCHITECTURAL FINISHES,
INC. d/b/a PORTER PAINTS,

                     **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary

Judgment [76] and Plaintiff's Motion for Leave to File Sur-Response [93].[1]

## I.    BACKGROUND

In this suit, Plaintiff Ray Heflin, Jr. ("Heflin") claims that Defendants

violated his rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §

12101 et seq., by discriminating against him and refusing to provide reasonable

accommodations for atrial fibrillation, a heart condition Heflin alleges he suffers.

---

[1] Having considered Plaintiff's Sur-Response, the Court GRANTS the
Motion for Leave to File [93].

Heflin also claims that Defendants retaliated against him for protected speech under the ADA by suspending then terminating him.[2]

Heflin was hired as an inside sales associate by Defendant PPG in September of 1996.  He worked at that position until his termination in 2005. Heflin's job duties consisted of both physical labor, including unloading deliveries of paint and stocking gallons of paint in the store, and other duties, such as setting up the store, mixing paint, keeping the display floor clean and orderly, putting prices on the products, and dealing with customers.

On May 8, 2003, Heflin received a corrective review for job performance issues from store manager John Peteet ("Peteet").[3]  After receiving the review, Heflin told Peteet that he was sick.  Heflin then went home and called PPG's Human Resources Department.  Heflin spoke with Jackie Lovely ("Lovely"), and

---

[2]  Heflin's First Amended Complaint also asserted a claim that Defendants violated his rights under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., by failing to promote him to a store manager position because of his age.  In response to Defendants' motion for summary judgment, Heflin withdrew this claim.

[3]  The parties disagree over whether Heflin received a corrective review or was merely threatened with one.  For the purposes of this motion, the only relevant facts are that Heflin was reprimanded either officially or unofficially, became upset, went home, and called Human Resources.  These facts are undisputed.

complained that Peteet treated him unfairly and often singled him out for poor treatment.  Heflin specifically complained that, eight months earlier, Peteet threw a set of truck keys at Heflin and hit him in the face (the "key throwing" incident). Lovely's notes of the interview, submitted to the Court by Heflin, state that Heflin "called to complain about Mgr. (John Peteet)."  (Pls. Resp., Ex. B.)  Heflin's complaints included:

- no floating holidays
- hit in face w/ keys
- hit him on more than one occasion
- abuses him
- discriminates
- throws things
- always finds something wrong with what he does
- hollers @ him first thing every morning
- causes him to become upset causing him to mismatch paint
- hollered @ him because he didn't have coffee ready
- complained about his work even though he stayed late to catch up (not pd [sic] for this time) . . . .

(Id.)

Lovely's notes further indicate that "Ray was very emotional.  Began to cry."  (Id.) It is undisputed that Heflin had not yet begun to suffer atrial fibrillation at this time.  The "discrimination" he referred to in this call appears to be treatment that

he perceived to be unfair generally, and not treatment related to his atrial fibrillation.[4]

PPG investigated the key-throwing incident and counseled Peteet about his management skills.  In May of 2003, Heflin then reported Peteet and PPG employee David Morris ("Morris") for falsifying timecards.  After investigating the matter, store group manager Keith Roche ("Roche") recommended that Peteet and Morris receive final written warnings.  PPG followed the recommendation. Shortly thereafter, Heflin was assigned to a "relief" role in which his job assignments rotated between different store locations to assist when other stores had staff shortages due to vacation, sickness, or leave.

In November of 2004, while driving between stores, Heflin blacked out.  He was taken to a hospital and diagnosed with atrial fibrillation, a common cardiac disorder defined as abnormal rhythm of the atria.  Heflin's symptoms included shortness of breath, fatigue, and the blackout he experienced.  PPG approved Heflin for short-term disability leave.  Heflin took leave and was hospitalized for

---

[4]  Heflin made this call in 2003.  He did not suffer any symptoms of atrial fibrillation until November of 2004.

treatment.  Heflin completed treatment and was released without restriction to return to work.

In January of 2005, Heflin resumed work at his inside sales associate position with PPG.  Heflin's doctor did not restrict Heflin from performing any particular kind of work.  Heflin claims that his work was largely unaffected by atrial fibrillation and that he could perform his job virtually as well in January of 2005 as before he suffered atrial fibrillation.  The only limitation Heflin claims he suffered as a result of his atrial fibrillation was that he occasionally needed to slow down when performing strenuous tasks, such as lifting paint.  Heflin does not claim that his work performance was negatively affected by working at the pace required by his condition, nor does the record show that he was criticized for working too slowly because of his condition.

When Heflin returned to work, he claims that he had a discussion with Roche concerning whether he had any limitations from the atrial fibrillation.[5] Heflin claims that he gave Roche a doctor's letter clearing him to work without restriction.  Heflin also claims that he requested an hour-long lunch break.[6]  Heflin

---

[5] Roche denies having any conversation with Heflin concerning his condition after Heflin resumed his duties.  (Roche Dep. at 47.)

[6] Heflin was only permitted a thirty-minute period in which to eat his lunch.

claimed that his doctor told him that a longer lunch break would reduce the stress on his heart.  Heflin did not provide any documentation from his doctor stating that a longer lunch was necessary or useful to Heflin for managing his atrial fibrillation.  Heflin claims that Roche referred him to store manager Jerry Townsend ("Townsend"), Heflin's immediate supervisor.

It is undisputed that Heflin asked Townsend for an hour-long lunch-break.  Townsend denied the request.  Heflin also claims that he asked to be assigned to one store rather than constantly shifting between different store locations.  This request was apparently also denied.  Heflin states that he never discussed with Roche or Human Resources Director Russ Moses ("Moses") Townsend's refusal to give him longer lunch breaks or to take him off of relief duty.  (Heflin Dep. at 118.)  Heflin states that Townsend was the only person at PPG to whom he complained about treatment related to his atrial fibrillation.  (Id.)

After returning to PPG, Heflin successfully completed the duties of an inside sales associate for five months, including strenuous duties such as lifting paint cans and unloading shipments.  Heflin notes that on one day, he unloaded 17 pallets of freight before lunch.  Heflin claims that the pallets carried approximately 60,000 pounds of paint.  "Seventeen pallets of freight is a lot of weight, and lot of volume,

-6-

a lot of work, and I did it all by myself." (Heflin Dep. at 180.)  Heflin claims to be

capable of performing all the tasks required of an inside sales associate, including

unusually strenuous tasks such as unloading seventeen pallets alone, despite his

atrial fibrillation.  Heflin claims that he is only limited in performing exceptionally

high-intensity tasks, like sprinting.  (Id.) ("Q: Is there any particular activity you

can't do because of your heart condition?  A: I can't run fast.").  Heflin does not

claim that he was ever requested to run fast as part of his duties as an inside sales

associate.

　　In the summer of 2005, Heflin applied unsuccessfully for a store manager

position.  After he learned that he had not obtained the promotion, Heflin began

complaining that PPG treated him "unfairly." (Heflin Dep. at 58.)  The record does

not show that any of Heflin's complaints of unfair treatment concerned or referred

to his atrial fibrillation.[7]

　　On June 15, 2005, Roche confronted Heflin about his complaints:

> I took Ray into the warehouse because this is not the kind
> of conversation that you want to have on the showroom
> floor.  And I kind of replayed what I had been hearing,
> that he appeared to be very unhappy, he didn't like the

_____

[7] Heflin's complaints may have related to concerns that he was being
discriminated against on the basis of his age.  Heflin has dismissed his age-
discrimination claim from this lawsuit.

> way we managed the business, he felt like he was being
> passed over, and so forth.  And I told Ray, I'm going to
> give you two options and the decision is totally up to
> you.  Option one, you can give me your resignation and
> you can date it four to six weeks out. . . . [O]ption two,
> Ray, if you want to stay–this is your call–if you want to
> stay, you've got to quit the complaining.  You've got to
> start following proper channels.  If you've got an issue or
> you've got a problem, you've got to follow procedure.
> Complaining in the stores and complaining to the
> customers has got to stop.

(Roche Dep. at 183-84.)

Roche testified that Heflin's complaints consisted of "dredging up old issues

. . . Most of them had to do with John Peteet."  (Id. at 185.)  Roche stated that

Heflin did not complain about discrimination or any other matter related to his

atrial fibrillation.  (Id. at 193.)

Heflin testified to a different version of this conversation:

> The major points, he got in my face, started shaking his
> finger in my face, because of John Peteet and David
> Morris almost got fired because I snitched on them.  I
> reported a timecard infraction.  It was so bad that he had
> to give them a corrective review for a whole year and
> now he had taken it out.

(Heflin Dep. at 54.)

Heflin admitted that Roche confronted him about complaining to customers.

Heflin claims that he had been complaining about "unfair treatment."  The only

"unfair treatment" Heflin mentions in this portion of his deposition testimony is

being passed up for a promotion to store manager.  (Id. at 54-91.)  When asked

specifically about the content of his complaints, Heflin stated only that he

complained about the promotion:

> Q:    Had you said things about the company to
>        customers?
> A:    I probably said I didn't think I was being treated
>        fairly.  All of my customers knew I wasn't going to
>        go anywhere.  I love that company.  I love the
>        products.  I was proud to sell them.
> Q:    You complained to customers about not getting
>        promoted to store manager, didn't you?
> A:    I think so, yeah.  That would be fair.

(Id. at 58.)

Heflin said that the "only two reasons" that Roche asked for his resignation were

because he complained to customers about "unfair treatment" and because he

seemed unhappy.  (Id. at 60.)  It is clear from Heflin's deposition record that the

"unfair treatment" about which he was complaining and about which Roche

confronted him concerned the promotion to store manager and other work

condition issues unrelated to his atrial fibrillation:.

> Q:    Did you ever talk to anybody in
>        management at PPG about being treated
>        differently from other inside salespeople?
> A:    Yea.  On June the 15th, I discussed it with
>        [Roche].  And prior to that, I told
>        [Townsend] that I didn't think he was
>        treating me fairly because he made me work

> all these Saturdays.  He said he didn't care.
> He was the boss.  He could do as he pleased.
> I talked to [Peteet] several times, you know,
> come on guy, ease up.  You know, you're
> killing me here emotionally . . . .

(Id. at 90-91.)

Heflin does not claim that his atrial fibrillation was ever expressly raised in these conversations.  Heflin testifies only that it is his opinion that Roche's real motive in raising these other issues was Heflin's atrial fibrillation, or possibly Heflin's age.  "Whether you say it was age or whether you say it was disability or whether you say it was anything, I think it had to do with my age and I think it had to do with my disability."  (Id. at 72.)

Heflin and Roche spoke again on June 17th.  During this conversation, Heflin refused to resign, and restated his desire to be a store manager.  Roche offered to provide training for Heflin.  Neither Roche nor Heflin testify that any issue pertaining to Heflin's atrial fibrillation was raised during this conversation.

Between June 15 and June 21, 2007,  PPG terminated sales associate Rodney Goodson ("Goodson") for making threatening remarks to an assistant manager.  At the time Goodson was terminated, he informed Moses that Heflin had actually choked a PPG manager and was still employed.  Moses asked Roche to investigate the allegation.  Several of Heflin's co-workers reported that Heflin told them that

-10-

he had at some point in the past choked Peteet during an argument.  During this time, an inside sales associate approached Roche and informed him that Heflin had also threatened to kill three other PPG employees.

On June 21, 2005, Roche suspended Heflin at Moses's direction.  Roche and Moses investigated the alleged threats, and concluded that Heflin had not choked Peteet, but had told several coworkers that he wished he had choked Peteet.  Moses testified:

> A:    I have a statement from Ray [Heflin] saying he wished he would have choked John [Peteet].  That was the more concerning statement.  I established that the [choking] incident did not happen.  Through witnesses, I did establish as well . . . Ray did, indeed say that he had choked John . . . .
> Q:    And that was important to you; right?
> A:    That was very important to me. . . . in terms of the overall case.  Because the issue started out as an investigation of Ray saying he was going to kill three people.  The choking incident came up as kind of an, of, by the way, this also happened.

(Moses Dep. at 113-14.)

Heflin admits to making this statement, but states that he made it directly after Peteet struck him in the face with car keys.  (Heflin Dep. at 133-36.)  Heflin also admits to making threats concerning other PPG employees, although he claims the statements were in jest:

-11-

> [Another co-worker] goes and says, well, Ray, what
> would you do if they fired you like Rodney [Goodson]? I
> said, oh, I'd kill 'em. He says, who would you kill? I
> said, all of them. We're laughing and joking and joking
> and laughing still. I mean, nobody's taking me serious.
> And then he goes, well, who would you kill? I said, well,
> I guess I'd start with Keith [Roche] and then Jerry
> [Townsend] and then Sean [Linderoth]. You know,
> they're the ones that give me all the grief.  And we're
> still laughing and we're still talking. So nobody took me
> seriously, or at least I didn't think they took me seriously.

(Id. at 126.)

On July 12, 2005, Heflin called PPG's Ethics Hotline and reported that he

believed he was being retaliated against for complaining about Peteet's misconduct

in 2003, and particularly for complaining about the key-throwing and timecard

falsification incidents.  The Ethics and Compliance Report generated as a result of

the call did not mention Heflin's atrial fibrillation or his requests for

accommodation.

The record is unclear regarding the exact date on which Heflin was

terminated.  Heflin claims that he was terminated on June 30, 2005, and that Moses

did not receive emails about Roche's investigation of the threatening statements

until after he terminated Heflin.  Defendants claim that Heflin was terminated on

July 13, 2005, after Roche and Moses completed the investigation.  Heflin called

the Ethics Hotline again on September 9, 2007.  During that call, he indicated that

he was terminated on July 13, 2005.  Regardless of the exact date, it is undisputed

that he was terminated after June 21, 2007, after Goodson informed Roche that he

had made threatening statements, and after Moses and Roche were aware that

Heflin may have made death threats to other employees.  It is also undisputed that

on June 21, 2007, Roche informed Heflin that he was suspended for making the

threats.  (Heflin Dep. at 102.)

On May 25, 2006, Heflin filed suit in this Court alleging that Defendants

discriminated and retaliated against him in violation of the ADA.[8]  Defendants

filed the present motion for summary judgment, arguing that Heflin cannot make a

*prima facie* case for discrimination or retaliation under the ADA and, even if he

can, he was fired for making threatening remarks and not because of his atrial

fibrillation.

## II.    DISCUSSION

Summary judgment is appropriate where "the pleadings, depositions,

───────────────

[8]  Heflin also asserted a failure to promote claim under the ADEA, but
voluntarily dismissed that claim in response to Defendants' Motion for Summary
Judgment.

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings."  Id

The Court must view all evidence in the light most favorable to the party opposing the motion and must resolve all reasonable doubts in the non-movant's favor.  United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am., 894 F.2d 1555, 1558 (11th Cir. 1990).  "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."  Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d

at 1246.  "Where the record taken as a whole could not lead a rational trier of fact

to find for the nonmoving party, there is no genuine issue for trial."  <u>Scott v.</u>

<u>Harris</u>, 127 S.Ct 1769, 1776 (2007).

    A.   <u>Discrimination</u>

The ADA states:

> No covered entity shall discriminate against a qualified
> individual with a disability because of the disability of
> such individual in regard to job application procedures,
> the hiring, advancement, or discharge of employees,
> employee compensation, job training, and other terms,
> conditions, and privileges of employment.

42 U.S.C. § 12112(a).

The employee has the burden to establish a *prima facie* case of discrimination

under the ADA.  <u>Davis v. Fla. Power & Light Co.</u>, 205 F.3d 1301, 1305 (11th Cir.

2000).  To make a *prima facie* case, the employee must show: "(1) she has a

disability; (2) she is a qualified individual; and (3) she was subjected to unlawful

discrimination because of her disability."  <u>Morisky v. Broward County</u>, 80 F.3d

445, 447 (11th Cir. 1996).  Defendants argue that Heflin cannot show that he was

disabled or that Defendants terminated him because of his disability.[9]

---

[9]  Defendants also argue that Heflin failed to request a reasonable
accommodation.  Because the Court finds that Heflin was not disabled under the
ADA, it does not address this argument.

1.    *Disability*

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual."[10]  42 U.S.C. § 12102(2)(A).  Major life activities include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i).  Work is a major life activity under the ADA.[11]  Carruthers v. BSA Advertising., Inc., 357 F.3d 1213, 1216 & n.2 (11th Cir. 2004).

For the major life activity of work to suffer substantial limitation, the ADA "requires, at a minimum, that plaintiffs allege that they are unable to work in a

_____

[10]  The ADA alternatively defines "disability" as "having a record of" or "being regarded as having" an impairment that "substantially limits one or more of the major life activities of the individual."  42 U.S.C. § 12102(2)(B),(C).  The record shows that Heflin has no documentation that atrial fibrillation substantially limits his work.  It is also clear that PPG did not regard him as having an impairment that substantially limited his ability to work, for the simple reason that Heflin stated that he could and did in fact perform all of the tasks of an inside sales associate upon his return from disability leave.

[11]  Although the Supreme Court expressed reluctance in treating "work" generally as a "major life activity" under the ADA, Toyota Moto Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 200 (2002), the Eleventh Circuit has deemed work to constitute a major life activity under the ADA until it receives "a more explicit directive from the Supreme Court . . . ."  D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1227 n.4 (11th Cir. 2005).

-16-

broad class of jobs." <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471, 491 (1999).

"[A]n individual's ability to work is 'substantially limited' when the individual is

'significantly restricted in the ability to perform either a class of jobs or a broad

range of jobs in various classes as compared to the average person having

comparable training, skills, and abilities." <u>D'Angelo v. ConAgra Foods, Inc.</u>, 422

F.3d 1220, 1227 (11th Cir. 2005) (citation omitted). <u>See also</u> 29 C.F.R.

§ 1630.2(j)(3)(i). A person "whose mental or physical impairment is corrected by

medication or other measures does not have an impairment that presently

'substantially limits' a major life activity." <u>Greenberg v. BellSouth Telecomms.,</u>

<u>Inc.</u>, 498 F.3d 1258, 1264 (11th Cir. 2007) (citation and quotation omitted).

    A physical impediment that causes an employee to work more slowly or less

efficiently at one particular job, but does not restrict his ability to perform a broad

class of jobs, does not constitute a disability under the ADA. In <u>D'Angelo</u>, a

plaintiff suffering from vertigo sued her employer under the ADA. D'Angelo, the

plaintiff, worked on an assembly line, and she found that the sight of the conveyor

belt aggravated her vertiginous condition. <u>Id.</u> at 1222. D'Angelo provided

documentation that she had vertigo, informed her superiors that the conveyor belt

aggravated her condition, and asked to be assigned to a different job away from the conveyor belt.  Id. at 1223.  In response, her employer terminated her.  Id. at 1224.

D'Angelo filed suit, alleging that her former employer violated the ADA by failing to provide a reasonable accommodation and by terminating her.  Id.  The district court found on summary judgment that D'Angelo was not actually disabled under the ADA because her vertigo did not substantially limit her ability to work. Id.  The Eleventh Circuit upheld this ruling, finding that D'Angelo had failed to show a genuine issue of fact regarding whether vertigo substantially limited her ability to work.  The court reasoned, "D'Angelo has argued, however, only that her vertigo interferes with her ability to work as a product transporter at Singleton's seafood plant, not that she is restricted in her ability to perform 'a class of jobs' or 'a broad range of jobs in various classes.'" Id. at 1227.  "Plaintiff's proven ability to work contradicts any contention that she was substantially limited in the major life activity of working."  Id.

In the present case, there is no genuine issue fact regarding whether Heflin is substantially limited in the life activity of working.  Heflin admits that his atrial fibrillation requires him only to slow down on occasion.  Heflin admits that he is still able to perform manual labor generally, and the tasks of an inside sales

associate particularly, at a satisfactory pace.  In other words, Heflin does not claim

that atrial fibrillation renders him unable to perform any class of jobs in the area of

manual labor.  Heflin's proven ability to work contradicts his contention that he is

substantially limited in the area of work.[12]


     2.      *Subjected to Unlawful Discrimination*

Even if Heflin were disabled under the ADA, which the Court finds he was

not, there is no genuine issue of fact regarding whether PPG subjected him to

unlawful discrimination by suspending and terminating him.  The Eleventh Circuit

has recently set forth a framework for determining when a plaintiff has shown

discriminatory termination under the ADA in cases like this:

> In addition to requiring the plaintiff to show that he was
> "unlawfully discriminated against"-that is, that his
> employer failed to reasonably accommodate his
> disability, leading to an adverse employment decision-the

---

[12]  The record shows that the simple discipline of slowing down or taking
occasional breaks serves to correct any symptoms of Heflin's atrial fibrillation.
Even if Heflin's condition did cause a substantial limitation to his ability to work,
it is correctable by the measure of slowing down.  Nothing in the record shows that
Heflin would require an accommodation from PPG merely to work at a slightly
slower pace when performing the physically strenuous aspects of his duty.
Because Heflin can correct his condition through simple measures that do not
require accommodation, he is not "disabled" under the ADA.

> plaintiff must show that this discrimination occurred
> "because of his disability"-that is, that the adverse
> employment decision was caused by his disability. In this
> case, for instance, Holly bears the burden of showing not
> only that Clairson failed to reasonably accommodate his
> disability, but that, but for Clairson's failure to
> accommodate his disability, he would not have been
> terminated-in other words, Holly must show that his
> disability caused him to be late, so that Clairson's failure
> to give him any leeway in its punctuality policy, leading
> to his termination, amounted to termination "because of
> his disability."

Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1263 n. 17 (11th Cir. 2007).

There is no evidence in the record that Heflin was suspended and terminated for having the condition of atrial fibrillation, for requesting a longer lunch break, or for requesting a permanent work location. Defendants claim that Heflin was fired for threatening the lives of three employees, and for claiming to have choked a manager. Heflin admits to making these statements, and there is no dispute that making such statements constitutes grounds for termination at PPG.[13]

Heflin argues only that the investigation of these threats did not occur until after his termination, and the timing of the investigation presents an issue of fact on the reason he was terminated. Heflin misapprehends his burden under the ADA. Heflin must make some showing of some causal relationship between his atrial

---

[13] The record shows that PPG terminated Goodson in June of 2005 for making similar threats.

fibrillation or request for accommodation and PPG's decision to suspend and terminate him.  Heflin's suggestion that the death threats he made against other employees was not the "real" reason for his termination does not establish that the "real" reason was related to his atrial fibrillation.  Heflin has, at most, suggested that the real reason for his termination may have been revenge for reporting misconduct by John Peteet in 2003, or that the real reason may have been his age. The record does not contain any evidence that Heflin suffered adverse employment actions because of his atrial fibrillation.

    B.    <u>Retaliation</u>

Heflin also claims that PPG retaliated against him in violation of the ADA. Heflin alleges that PPG retaliated against him for calling Human Resources on May 8, 2003, for complaining about "discrimination" to Roche on June 15 and 17, 2005, and for calling the Ethics Hotline on July 12, 2003.  For the reasons set forth below, this claim fails as a matter of law.

To sustain an ADA retaliation claim, a plaintiff must show: "(1) that he engaged in conduct protected by the ADA; (2) he was subjected to an adverse employment action at the time, or after the protected conduct took place; and (3) the defendant took an adverse employment action against him because of his

protected conduct." <u>Collado v. United Parcel Service, Co.</u>, 419 F.3d 1143, 1158 (11th Cir. 2005) (quotations and citation omitted).  For an expression to be protected under the ADA, the plaintiff must show that he "subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, [and] also that his belief was objectively reasonable in light of the facts and record presented."  <u>Weeks v. Harden Mfg. Corp.</u>, 291 F.3d 1308, 1312 (11th Cir. 2002).

### 1.    *Protected Expression*

Heflin cannot make a *prima facie* case of retaliation because he did not engage in any expression protected by the ADA.  Heflin's May 8, 2003, call to Human Resources occurred more than a year before he began suffering from atrial fibrillation.  Although Heflin complained about "discrimination" during this call, it was a logical impossibility for that "discrimination" to refer to atrial fibrillation. The call does show, however, that Heflin uses the word "discrimination" in its broadest sense to refer to unfair treatment generally, and not to refer specifically to unfair treatment based on a legally protected classification such as disability.

Heflin also claims that he engaged in protected expression by complaining about "discriminatory treatment" to Roche on June 15 and 17, 2003.  The record

shows, however, that Heflin did not expressly mention his atrial fibrillation or requests for accommodation at any point during these conversations.  Heflin's deposition testimony shows that the complaints he discussed with Roche related generally to his complaints about his treatment by PPG as an employee, being passed over for promotion, and having to work on Saturdays.  Roche testified that Heflin did not mention atrial fibrillation during this conversation.  Although Heflin apparently believes that his atrial fibrillation was the "real" reason behind the conversation, he does not identify a single fact to support this speculation.  Further, Heflin did not allege in his deposition that his atrial fibrillation was mentioned or discussed during these conversations.[14]

Heflin's July 12, 2003 conversation with the Ethics Hotline also was not an expression protected by the ADA.  Both Heflin's deposition testimony and the report generated by PPG show that Heflin complained that he was being "discriminated against" not for atrial fibrillation, but rather for informing on Peteet in 2003 for the key throwing and timecard falsification incidents.  Even if Heflin was, as he claims, terminated in retaliation for calling the Ethics Hotline and

_____

[14]   Moreover, Heflin's conversation with Roche was not communicated to Moses, who made the decision to terminate Heflin.  So, even if Heflin had engaged in expression protected under the ADA to Roche, he has made no showing that Moses was aware of that expression when he made the termination decision.

continuing to complain about Peteet's misconduct, the Ethics Hotline call did not concern Heflin's atrial fibrillation.  The record shows that the "discrimination" of which Heflin complained referred only to his belief that he was being treated poorly as an employee, and not to poor treatment related to any protected classification.  This conclusion is strengthened by Heflin's liberal and broad use of "discrimination" throughout his own deposition to refer to any negative outcomes for himself.  Generalized complaints of unfair treatment not related to disability are not protected expressions under the ADA.  Accord, Wehunt v. R.W. Page Corp., 352 F. Supp. 2d 1342, 1358 (M.D. Ga. 2004).

    2.    *Pretext*

    Once a *prima facie* case has been established, "the employer has the burden of articulating a legitimate nondiscriminatory reason for the challenged employment decision."  Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1336 (11th Cir. 1999).  The plaintiff must "demonstrate that it will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation."  Id.  (citation omitted).  To overcome a legitimate, nondiscriminatory reason, a plaintiff must "present significant probative evidence that the articulated reason is merely a pretext for discrimination."  Elrod v. Sears,

Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991).  The pretext inquiry "is concerned with the employer's perception of the employee's performance, not the employee's own beliefs."   Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1332-33 (11th Cir. 1998).  An employer "may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."  Nix v. WLCY Radio, 738 F.2d 1181, 1187 (11th Cir. 1984).

Even if Heflin had made a *prima facie* showing of retaliation, the claim would still fail as a matter of law.  Defendants claim that Heflin was suspended and terminated for the legitimate, nondiscriminatory reason that Heflin threatened three other employees with harm and claimed to choke a store manager.  Heflin admits that he made these threats, that they constituted terminable offenses, and that another employee was terminated in 2005 for making similar threats.

Heflin's argument that this reason is pretextual is insufficient to defeat summary judgment.  Heflin presents no significant, probative evidence that Defendants suspended and terminated him for a reason other than his threatening statements.  Heflin claims that his threats against other employees were only raised after he complained of discrimination and refused to resign.  Heflin also claims that

the investigation of the alleged threats did not even begin until after he was terminated.[15]

It is undisputed that Heflin was suspended on June 21, 2007.  It is further undisputed that Roche cited the alleged threats as the reason for the suspension.  It is undisputed that Heflin was terminated at some point after he was suspended, and the only evidence in the record shows that he was terminated on July 13, 2007. Between the time of his suspension and July 13, Roche and Moses conducted an investigation in which they concluded that Heflin had made multiple serious threats.  Moses directed Roche to terminate him.  Heflin does not present any evidence to raise a genuine issue of fact as to this series of events, or to show that the threats were a pretext for terminating him.

Heflin's argument relies on his assertion that he was actually terminated on June 30, 2007, prior to the bulk of the investigation into his threats.  Heflin has not provided any evidence beyond his own unfounded opinion that he was terminated on any date other than July 13, 2007.  Regardless of the actual date of Heflin's termination, the record shows that Roche and Moses took action against Heflin

---

[15]  As noted above, Heflin claims to have been terminated on June 30, 2007. Heflin offers no evidence for this assertion.  PPG has offered evidence that Heflin was terminated on July 13, 2007.

only after they were made aware of the threatening statements.  (Roche Dep. at 131.)  It is undisputed that the threats were given to Heflin as the reason for his suspension.  It is undisputed that Roche and Moses began to investigate the threats on or before the date Heflin was suspended.  It is also undisputed that Heflin was terminated sometime after he was suspended.  Heflin's self-serving speculation that threats were a *post-hoc* justification for his termination is not significant probative evidence adequate to show pretext.  "Where the defendant's justification evidence completely overcomes any inference to be drawn from the evidence submitted by the plaintiff, the district court may properly acknowledge that fact and award summary judgment to the employer."  <u>Grigsby v. Reynolds Metals Co.</u>, 821 F.2d 590, 597 (11th Cir. 1987).

## III.   CONCLUSION

For the foregoing reasons, and because the record as a whole shows that no genuine issues of fact exist and the record as a whole would not support a finding in Heflin's favor on any claim by a rational trier of fact,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [76] is **GRANTED**.

-27-

**IT IS FURTHER ORDERED** that Plaintiff's Motion to File Sur-Response
is **GRANTED**.

**SO ORDERED** this 5th day of November, 2007.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE